IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| STANLEY EDELSTEIN, IVAN GERARD, PAT HOY, BARRY BLUE, ROBERT CAMPNEY, GROVONDA COLEMAN, WAYNE COREY, PETER DANIELSON, WILLIAM GOLDMAN, DANA HAMIK, MICHAEL HICKS, BILL KELLER, RICHARD NEVINS, JOE SCHUETTE, CHRISTL UPCHURCH, LORRAINE VASHON, TIM WHITTINGHILL, and PACESETTER CORPORATION AMENDED AND RESTATED KEY EXECUTIVE RETIREMENT PLAN,<br><br>Plaintiffs,<br><br>v.<br><br>OPTIMUS CORPORATION,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 8:10-cv-00061-JFB-FG3<br><br>MEMORANDUM AND<br><br>ORDER |

This matter is before the court on defendant's motion to disqualify plaintiffs' counsel (Doc. 22). The court has considered the briefs and evidence filed by the parties and finds that the motion should be denied.

**FACTUAL BACKGROUND**

This is an action under the Employee Retirement Assistance Act of 1974, 29 U.S.C. § 1001 (ERISA). The plaintiffs are represented by Fraser Stryker PC LLO ("Fraser Stryker"). The defendant ("Optimus") is represented by McGrath North Mullin & Kratz, PC LLO ("McGrath North").

Optimus was formerly known as The Pacesetter Corporation. Optimus alleges that Steven R. Bloch, a partner at Fraser Stryker, has provided legal representation and counseling to Optimus and Pacesetter. Fraser Stryker has also provided legal services to AmeriFirst Home Improvement Finance Company ("AmeriFirst"), a wholly-owned subsidiary of Optimus. Specifically, Mr. Bloch provided legal assistance and counseling related to the March 31, 2004

sale of The Pacesetter Corporation's sales and manufacturing divisions to a newly-created entity known as The Pacesetter Corporation of America (the "asset sale").

Plaintiffs are former employees, or beneficiaries of former employees, of The Pacesetter Corporation who went to work for The Pacesetter Corporation of America after the 2004 asset sale. The Pacesetter Corporation Amended and Restated Key Executive Retirement Plan ("KERP Plan") is an unfunded ERISA plan which is the subject of this lawsuit.[1] The KERP Plan was implemented in November 1981 and required 15 years of service before a participant would be 100% vested. The KERP Plan was considered in the asset sale as to the allocation of assets and liabilities. The liabilities considered included liabilities to the named plaintiffs under the KERP Plan.

According to Optimus, Mr. Bloch was actively involved in the asset sale and participated in the discussions relating to the KERP plan. Based on recommendations received from counsel and after several discussions on the subject, it was determined that the KERP Plan would remain a liability of The Pacesetter Corporation (now Optimus Corporation).

Don Kluthe, President of Optimus and the Chief Financial Officer of AmeriFirst has worked with Mr. Bloch and Fraser Stryker on matters other than the asset sale. Even after this lawsuit was commenced, Kluthe received correspondence from Fraser Stryker, including an invitation to the 2010 Fraser Stryker Employment Law Client Conference (Doc. 23-1, Kluthe Aff. Ex. A). He also received an invitation to attend a Healthcare Reform Seminar hosted by Fraser Stryker. (*Id.*, Ex. B).

Mr. Kluthe and Mr. Harley Schrager (Corporate Secretary and Director of Optimus) state that Optimus has not terminated its relationship with Mr. Bloch or the Fraser Stryker law firm, nor has Optimus consented to Fraser Stryker handling legal matters adverse to Optimus.

In response, Fraser Stryker advises that its billing records reflect that the only time Fraser Stryker rendered legal services to Pacesetter was in 2003, when Mr. Bloch "logged 20 hours analyzing issues and providing consulting services with regard to the sale of certain assets or spin-off of certain divisions of Pacesetter to an unrelated company." (Doc. 25, Bloch Aff. at ¶ 3). According to Mr. Bloch, McGrath North was the primary counsel for Pacesetter on that project. Mr. Bloch states that he does not recall any discussion of the KERP Plan and he did not

---

[1] In December 2008, Optimus advised the participants that the KERP Plan was terminated. In this lawsuit, the plaintiffs allege that they were coerced into signing Settlement Agreements and Releases for payments equal to 50% of the expected Plan benefits on or before April 1, 2010. They ask that the court determine the amount of lump sum benefits to which they are entitled to under the KERP Plan, enforce their rights to benefits and payments under the terms of the KERP Plan, and find that the Settlement Agreements and Releases are invalid and unenforceable.

render any legal services or counseling related to the administration, vesting rights or eventual termination of the KERP Plan. The only time the Fraser Stryker firm rendered legal services to AmeriFirst was in 2006, when the firm logged 7.3 hours researching the status of applications to the Federal Deposit Insurance Corporation for industrial loan companies licenses and consulting with AmeriFirst regarding the same. The firm's services rendered to Pacesetter in 2003 and the services rendered to AmeriFirst in 2006 did not relate to the KERP Plan.

Fraser Stryker's Special Projects Coordinator advises that the firm invited 1,167 attorneys, clients and former clients, and other local professionals to its 2010 Employment Law Conference. The firm also co-sponsored Healthcare Reform Seminars with SilverStone Group. It sent press releases to local news and media outlets, and invited 1,122 attorneys, clients and former clients, employees, officers, and directors from local corporate entities, and other professionals to the Healthcare Reform Seminars held in Omaha, Grand Island and Sioux Falls. (Doc. 25 at pp. 7-8, Ex. 2B, Jennings Aff.).

## DISCUSSION

"""Because of the potential for abuse by opposing counsel, "disqualification motions should be subjected to particularly strict scrutiny.""" *Macheca Transp. Co. v. Philadelphia Indem. Co.*, 463 F.3d 827, 833 (8th Cir. 2006) (quoting *Harker v. Comm'r*, 82 F.3d 806, 808 (8th Cir. 1996)). "Although the moving party must satisfy a high standard of proof to sustain a disqualification motion, any legitimate doubts, which are created by the movant's proffer, must be resolved in favor of disqualification." *Olson v. Snap Prods., Inc.*, 183 F.R.D. 539, 542 (D. Minn. 1998).

A party has the right to choose its own legal counsel, and "'the extreme measure of disqualifying a party's counsel of choice should be imposed only when absolutely necessary.'" *Macheca Transp. Co.*, 463 F.3d at 833. Thus, motions to disqualify counsel are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law. *In re Kennedy*, 2008 WL 1052039 (Bankr. D. Neb. Apr. 8, 2008) (citing *In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992)); *Steele v. Lacey*, 1997 WL 138974 at *1, 4:CV96-3342 (D. Neb. Mar. 26, 1997).

As Magistrate Judge Piester observed in *Board of Regents of the Univ. of Neb. v. BASF Corp.*, 2006 WL 2385363 at *5, Case No. 4:04-cv-03356 (D. Neb. Aug. 17, 2006), the District of Nebraska

> has specifically not incorporated any particular code or ethical rules of professional conduct. Instead, the applicable local rule establishes as a general rule that an attorney admitted to practice must not engage in "conduct unbecoming of a member of the bar." NEGenR 1.7(b)(2)(B). The rule permits

> the court to consult others' rules or codes of professional conduct if it would be helpful in resolving issues before it. *Id.*

Although doubts should be resolved in favor of disqualification, the party arguing for disqualification bears the burden of demonstrating clearly that continuing representation would be impermissible. *Engineered Prods. Co. v. Donaldson Co., Inc.*, 290 F. Supp. 2d 974, 980 (N.D. Iowa 2003); *A.J. by L.B. v. Kierst*, 56 F.3d 849, 859 (8th Cir. 1995).

### A.  Is Optimus a current client of Fraser Stryker?

In general, a lawyer's actual authority to represent a client ends when the representation ends as provided by contract or because the lawyer has completed the contemplated services. Restatement Third of the Law Governing Lawyers ("Restatement"), § 31(2)(e). "[T]he law will usually imply an end to that relationship in a situation where it would be objectively unreasonable to continue to bind the parties to one another." Richard E. Flamm, *Lawyer Disqualification* § 14.6 (Banks & Jordan Law Pub. Co. 2003).

> A client and lawyer might agree that the representation will end at a given time or on the happening of a stated event (*see* Restatement Second, Agency §§ 105 & 107). Alternatively, the client and lawyer may contemplate a continuing relationship in which the lawyer will handle legal matters as they arise. Such a contract defines the scope or aims of the representation (see § 19(1))....
>
> The lawyer's authority ordinarily ends when the lawyer has completed the contemplated services (*see* Restatement Second, Agency § 106). A lawyer who has been retained to represent a client in a divorce, for example, has no authority to negotiate subsequent modifications of support or custody agreements without new authorization from the client.
>
> The course of dealing might not clearly indicate what services were contemplated in the representation or whether the lawyer has a continuing duty to advise the client. Such uncertainty could lead to clients assuming that they were still being represented. Because contracts with a client are to be construed from the client's viewpoint (*see* § 18), the client's reasonable understanding of the scope of the representation controls. The client's relative sophistication in employing lawyers or lack thereof is relevant.

Restatement § 31, Comment *h*.

Optimus appears to contend it has an ongoing attorney-client relationship with Fraser Stryker beginning with the work completed by Mr. Bloch for Pacesetter in 2003 and for AmeriFirst in 2006. Optimus advises that it did not formally "terminate" its relationship with Bloch or Fraser Stryker when the work was completed, and officers of Optimus and AmeriFirst,

some of whom are personal friends of Mr. Bloch, received invitations to the 2010 seminars sponsored by Fraser Stryker.

In this instance, there is no evidence of a general retainer agreement between Optimus and Mr. Bloch or the Fraser Styker law firm, and the firm did not represent Optimus on a regular basis. The affidavits submitted by all parties demonstrate that Mr. Bloch represented Pacesetter and AmeriFirst in a limited capacity for two specific transactions, the second of which was completed approximately four years ago.

"Normally, when the representation has achieved its aims, it is considered terminated." *In re Rossana*, 395 B.R. 697, 702 (Bankr. D. Nev. 2008); *see also Thayer v. Fuller & Henry, Ltd.*, 503 F. Supp. 2d 887, 892 (N.D. Ohio 2007) (termination may occur when the underlying action has concluded or when the attorney has exhausted all remedies in the case and declined to provide additional legal services on related issues). "Where a manifest 'affirmative act' is lacking, the court may consider evidence of the parties' subjective intent and the reasonable expectations of attorneys and clients in general." *Thayer*, 503 F. Supp. 2d at 892.

Although corporate representatives of Optimus and AmeriFirst have recently received commercial invitations from the Fraser Stryker law firm, such invitations were not sent exclusively to the firm's clients but were sent to hundreds of other people and businesses who were not clients. The sending of such mailings, without more, does not suffice to extend the duration of an attorney-client relationship. *See, e.g., Artromick Intern., Inc. v. Drustar, Inc.*, 134 F.R.D. 226, 231 (S.D. Ohio 1991) (observing that the common practice of sending a newsletter "to anyone whose name has appeared in the system" was not an action "imbued with the gravity of a conscious decision to remain wed to the client in such a manner that all others (with conflicting interests) must be forsaken"). Under the circumstances, it would not be reasonable to believe that Optimus enjoyed an ongoing attorney-client relationship with the Fraser Stryker law firm based upon the firm's sending promotional materials to officers of Optimus.

### B. Is the case at bar "substantially related" to the 2003-2004 Pacesetter asset sale?

After a lawyer's representation is terminated, the lawyer must "take no unfair advantage of a former client by abusing knowledge or trust acquired by means of the representation." Restatement § 33(d). Thus,

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

\* \* \* \*

>    (c)   A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
>
>    (1)  use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or
>
>    (2)  reveal information relating to the representation except as these Rules would permit or require with respect to a client.

Neb. Ct. R. of Prof. Cond. § 3-501.9(a). Matters are "substantially related" under this rule "if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." *Id.*, Comment [3]. *See also Jacob North Printing Co. v. Mosley*, 279 Neb. 585, 589, 779 N.W.2d 596, 600 (2010); *McCully, Inc. v. Baccaro Ranch*, 279 Neb. 443, 451-52, 778 N.W.2d 115, 121-22 (2010).

In determining whether a prior matter is substantially related to a later one, the court should consider

> whether the liability issues presented are similar; whether any scientific issues presented are similar; whether the nature of the evidence is similar; whether the lawyer had interviewed a witness who was a key in both causes; the lawyer's knowledge of the former client's trial strategies, negotiation strategies, legal theories, business practices, and trade secrets; the lapse of time between causes; the duration and intimacy of the lawyer's relationship with the clients; the functions being performed by the lawyer; the likelihood that actual conflict will arise; and the likely prejudice to the client if conflict does arise.

*Jacob North Printing*, 279 Neb. at 591, 779 N.W.2d at 601.

The Pacesetter asset sale was completed on approximately March 31, 2004, about six years before this case was filed. Optimus argues in its reply brief that Fraser Stryker was privy to Optimus' confidential financial information regarding its assets and liabilities at the time of the 2004 asset sale. Thus, Optimus concludes, this lawsuit is "substantially related" to the work performed for Pacesetter by Mr. Bloch in 2003-2004.

The court finds that this lawsuit is not "substantially related" to the work Mr. Bloch completed for Optimus in conjunction with the March 31, 2004 asset sale. The events leading to the disputed Settlement Agreements and Releases did not occur until after December 2008, when Optimus announced that the KERP Plan was terminated. The issues in this lawsuit involve the interpretation of an ERISA plan, specifically (a) the method used by Optimus to calculate the

amount of plaintiffs' vested benefits and (b) the validity and enforceability of the Settlement Agreements and Releases executed in or about September 2009. Although the complaint alleges that the individual plaintiffs and the Plan "are entitled to equitable restitution to the Plan for contributions that should have been made in satisfaction of the Plan's liability to the Individual Plaintiffs," this lawsuit does not appear to involve the financial condition of Pacesetter Corporation or Optimus as it existed during the brief period of Mr. Bloch's retention in 2003-2004.

## CONCLUSION AND ORDER

The court finds that Optimus has not met its burden of demonstrating clearly that the plaintiffs' continuing representation by the Fraser Stryker law firm would be impermissible. There is no concurrent conflict of interest between Fraser Stryker and Optimus, and this action is not substantially related to the services previously provided to Optimus by Fraser Stryker.

**IT IS ORDERED** that defendant's motion to disqualify plaintiffs' counsel (Doc. 22) is denied.

A party may object to a magistrate judge's order by filing an "Objection to Magistrate Judge's Order" within 14 days after being served with the order. The objecting party must comply with all requirements of NECivR 72.2.

**DATED September 24, 2010.**

                **BY THE COURT:**

                s/ F.A. Gossett, III
                **United States Magistrate Judge**